**MORGAN STANLEY & COMPANY, INCORPORATED, Petitioner,**

v.

**The TEXAS OIL COMPANY, Respondent.**

No. 95–0085.

Supreme Court of Texas.

Argued Sept. 20, 1995.

Decided June 20, 1997.

Rehearing Overruled Jan. 16, 1998.

Robin C. Gibbs, Chris Reynolds, Grant J. Harvey, Houston, for Petitioner.

William E. Matthews, William B. Allison, Richard N. Countiss, Houston, for Respondent.

HECHT, Justice, delivered the opinion of the Court, joined by PHILLIPS, Chief Justice GONZALEZ, CORNYN, SPECTOR, OWEN, BAKER and ABBOTT, Justices.

In *Holloway v. Skinner*, 898 S.W.2d 793, 798 (Tex.1995), we held that for an agent to be liable for tortious interference with its principal's contract, one prerequisite is that a "plaintiff must prove that the [agent] acted willfully or intentionally to serve the [agent's] personal interests at the expense of the [principal's]." In the case now before us we apply the same rule in a similar context— tortious interference with a prospective contractual relationship. Here, as in *Holloway*, we conclude that plaintiff is not entitled to recover as a matter of law.

**I**

Tenneco Inc. and Tenneco Oil Company (collectively "Tenneco") hired Morgan Stanley & Co., an investment banking firm, to sell Tenneco's wholly-owned subsidiary, Houston Oil & Minerals. Price was, of course, a key consideration to Tenneco, but other elements of the transaction were also important. Morgan Stanley made it clear to prospective buyers that once an initial purchase offer was made, various terms would have to be negotiated with Tenneco. Two main suitors emerged: Texas Oil Company and Seagull Energy Corporation. Both met with Tenneco and Morgan Stanley at separate times on the same day and made general proposals. Three days later Tenneco accepted Seagull's offer, and after further negotiations Tenneco and Seagull concluded an agreement.

Texas Oil then sued Tenneco, Morgan Stanley, and Seagull on a host of common-law and statutory claims, principally: breach of contract against Tenneco and Morgan Stanley; tortious interference against Morgan Stanley and Seagull; negligent misrepresentation against Morgan Stanley; and fraud, conversion, and conspiracy against all three. The district court granted summary judgment for all defendants, and Texas Oil appealed. Texas Oil dismissed its appeal as to Tenneco, and thus Tenneco's summary judgment became final. The court of appeals affirmed the summary judgment for Seagull in all respects, and affirmed the summary judgment for Morgan Stanley on all of Texas Oil's claims but one: tortious interference. The court of appeals held that subsisting fact questions precluded summary judgment for Morgan Stanley on Texas Oil's claim of tortious interference and remanded that claim for further proceedings. 917 S.W.2d 826, 836.

Morgan Stanley applied to this Court for writ of error; Texas Oil did not. Thus, the court of appeals' judgment, to the extent it is adverse to Texas Oil, has become final, and the only issue remaining is whether Morgan Stanley was entitled to summary judgment on Texas Oil's tortious interference claim. Of Morgan Stanley's several arguments, we need consider only one: that as a matter of law Morgan Stanley acted only in Tenneco's best interests and therefore could not have wrongfully interfered with Texas Oil's proposed dealings with Tenneco.

## II

Before reviewing the summary judgment record, we pause to explain exactly what it is we are looking for.

In *Holloway v. Skinner*, we observed that, for reasons of logic and law, a person must be a stranger to a contract to tortiously interfere with it, hence, a contracting party's agent or employee acting in the party's interests cannot interfere with the party's contract.

To establish a prima facie case [of tortious interference by an agent with the principal's contract], the alleged act of interference must be performed in furtherance of the defendant's personal interests so as to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract.

898 S.W.2d at 796. It is not enough, we explained, for the agent's actions to further its own interests; "[t]he plaintiff must prove that the [agent] acted willfully or intentionally to serve the [agent's] personal interests *at the expense of* the [principal's]." *Id.* at 798 (emphasis added).

Inasmuch as it is the duty of corporate officers to protect the interests of the corporation, ... the mere existence of a personal stake in the outcome, especially when any personal benefit is derivative of the improved financial condition of the corporation or consists of the continued entitlement to draw a salary, cannot alone constitute proof that the defendant committed an act of willful or intentional interference.... [E]ven a corporate agent's "mixed motives" to benefit himself as well as the corporation are insufficient to establish liability[.] ... [B]y itself, "it is immaterial that the actor also profits by the advice or that he dislikes that third party and takes pleasure in the harm caused to him by the advice"[.] ... Were this not the rule, virtually every failure to pay a corporate debt would constitute a prima facie case of tortious interference against the corporate officer who decided not to pay the debt.

*Id.* at 796 (citations omitted).

To show tortious interference, neither an agent's merely mistaken assessment of its principal's interests nor the possibility that the agent *might* have acted in its own interests and contrary to its principal's is enough. We held in *Holloway* "that the ultimate issue in a case of this nature is whether the corporation's agent acted in a manner *so* contrary to the corporation's interests that the agent could *only* have been motivated by personal interest." *Id.* at 797 (emphasis added).

In this case Morgan Stanley averred by affidavit that it acted at all times in Tenneco's best interests. This evidence, as the court of appeals correctly noted, entitles Morgan Stanley to summary judgment on

Texas Oil's tortious interference claim unless Texas Oil adduced evidence raising a fact issue. Thus the question becomes whether there is evidence that Morgan Stanley acted in a manner so contrary to Tenneco's interests that Morgan Stanley could only have been motivated by its own interests. Much of the evidence is vigorously disputed, and we view it, of course, in the light most favorable to Texas Oil, the nonmovant.

### III

We first examine whether Morgan Stanley acted contrary to Tenneco's interests. To do this, we must first summarize Texas Oil's account of the negotiations and the events that followed.

### A

For weeks before meeting with Tenneco and Morgan Stanley, Texas Oil and Seagull had an opportunity to evaluate Houston Oil and review the terms on which Tenneco proposed to sell that corporation. Besides price, Tenneco had five areas of particular concern:

*financing:* that the purchaser be able to arrange satisfactory financing without disadvantageous conditions;

*indemnity:* that the purchaser be able to indemnify Tenneco against Houston Oil's liabilities assumed by the purchaser;

*Enserch litigation:* that Tenneco retain Houston Oil's interest in certain litigation with Enserch Corporation;

*section 338 election:* that the purchaser agree to join Tenneco in electing to apply section 338(h)(10) of the Internal Revenue Code to the transaction; and

*draft terms:* that the purchaser agree to the terms of a stock-purchase agreement Tenneco had drafted.

Tenneco and Morgan Stanley met first with Seagull's CEO, who proffered a written proposal to purchase Houston Oil for $16,-160,000. The proposal indicated that Seagull would fund the purchase out of existing credit lines, satisfying Tenneco's financing concern, and appeared to assume that Tenneco would retain the Enserch litigation, although it did not expressly say so. While Seagull understood that it would be required to join

Tenneco in making a section 338 election, it did not commit in its offer to do so. Seagull's offer did not speak to the indemnity or draft terms.

Later the same day Tenneco and Morgan Stanley met with Texas Oil executives, who made an oral offer to pay $16.2 million for Houston Oil. Texas Oil represented that there were no financing contingencies but did not disclose its source of funds because it was not asked to do so. Texas Oil also orally agreed to provide Tenneco the required indemnity, to allow Tenneco to retain the Enserch litigation, to join Tenneco in making a section 338 election, and to be bound by the terms of Tenneco's draft agreement. Morgan Stanley asked what Texas Oil might do in the event that Tenneco received a higher bid, and Texas Oil replied that it would be willing to pay as much as $16.7 million. From what Morgan Stanley said, Texas Oil understood that its bid of $16.2 million was higher than any other; that it should not offer $16.7 million; that if Tenneco received a higher bid, Texas Oil would be given an opportunity to increase its bid; and that if Tenneco did not receive a higher bid the next day, Texas Oil's offer would be accepted.

Morgan Stanley told Texas Oil to put its offer in writing by the next day, and Texas Oil complied. However, Texas Oil's written offer did not reiterate its oral agreements; it was completely silent on the issues of financing, indemnity, the Enserch litigation, the section 338 election, and the terms of Tenneco's draft agreement. Also, Texas Oil's written offer imposed a new requirement that Tenneco provide $50,000 worth of office furniture and equipment to Houston Oil. Morgan Stanley did not submit Texas Oil's written offer to Tenneco.

After meeting with Seagull and Texas Oil, Tenneco and Morgan Stanley discussed the two offers. Morgan Stanley asserts that it was concerned that Texas Oil could not obtain satisfactory financing, but Texas Oil contends that there is nothing in the evidence to warrant such concern. The next day Morgan Stanley encouraged Seagull to increase its offer. Morgan Stanley did not solicit a higher offer from Texas Oil or tell Texas Oil of its efforts to obtain a higher offer from Seagull.

The second day after meeting with Morgan Stanley, Texas Oil called Morgan Stanley and was told that Tenneco had not received a higher offer and that Texas Oil's offer would be accepted as soon as someone at Tenneco signed it. Tenneco had not, however, accepted Texas Oil's offer; in fact, as already noted, Tenneco had not even seen Texas Oil's written offer. The third day following the meeting Seagull raised its offer to $16.4 million. Morgan Stanley told Tenneco that Seagull was the successful bidder, and Tenneco accepted Seagull's offer.

When Texas Oil learned of this, it contacted Tenneco directly, offering to pay $17.2 million for Houston Oil. Tenneco, however, on Morgan Stanley's advice, had signed a letter of intent with Seagull providing that Tenneco would not negotiate with anyone else for a period of time while efforts were made to reach complete agreement on all terms. Consequently, Tenneco refused to consider Texas Oil's offer.

During the period in which Tenneco agreed to negotiate with Seagull exclusively, Seagull balked at making the section 338 election, claiming that it was not part of the offer. The election was crucial to Tenneco for tax reasons but would cost Seagull $4.5 million. Although Morgan Stanley knew that Seagull had agreed during negotiations to make the election, it urged Tenneco to accommodate Seagull. To resolve the matter, Tenneco gave Seagull its interest in the Enserch litigation, worth $5.6 million, in exchange for a $1.6 million increase in the sales price, to $18 million, and Seagull's agreement to make the section 338 election. On this basis, Tenneco and Seagull eventually concluded an agreement. Texas Oil contends that if Tenneco had accepted its offer instead of Seagull's, Tenneco would not have had to make the same concessions to Texas Oil and would have made some $4 million more on the transaction.

**B**

On this evidence (most of which Morgan Stanley strongly disagrees with), Texas Oil contends that Morgan Stanley acted contrary to Tenneco's best interests by failing to tell Tenneco that Texas Oil had made or was willing to make a better offer for Houston Oil than Seagull. We find no evidence to support this contention.

We note that Texas Oil's written offer was not better than Seagull's. Texas Oil's offer stated a price of $16.2 million but required Tenneco to contribute $50,000 in office supplies and equipment. Texas Oil's offer did not address any of Tenneco's other five concerns. Seagull's offer stated a price of $16,160,000, $10,000 more than the net of Texas Oil's offer. It also disclosed a satisfactory source of financing, although it did not expressly address Tenneco's other four concerns. Taking the written offers only on their face, Seagull's was better.

But assuming Texas Oil is correct that Morgan Stanley did not tell Tenneco that Texas Oil had orally agreed to Tenneco's other concerns—indemnity, the Enserch litigation, the section 338 election, and the draft terms—even though they were not included in its written proposal, and that Texas Oil was willing to raise its price, there is still no evidence that Morgan Stanley failed to act in Tenneco's best interests. As demonstrated by Tenneco's negotiations with Seagull during the exclusive dealing period, price was only one issue; the other issues could drastically affect the net value Tenneco received from the sale. There is nothing to indicate that, when the time came to sign a formal agreement, Texas Oil was any more willing to accede to Tenneco on these issues than Seagull was. Assuming that Texas Oil had expressed a willingness to make Tenneco a better offer and that Morgan Stanley did not tell Tenneco, it simply cannot be inferred from these facts alone that Morgan Stanley acted contrary to Tenneco's best interests. There is no evidence that Tenneco was actually worse off selling to Seagull than to Texas Oil.

Tenneco is certainly a better judge of its own best interests than we are, or than a jury would be. Texas Oil argues that "the conduct of Morgan Stanley amounts to the theft of millions of dollars from Tenneco's coffers", but Tenneco does not join in this assertion. Texas Oil argues that Tenneco decided to "take its lumps" in this transaction rather than rupture a long-term rela-

tionship with Morgan Stanley, but there is no evidence that even hints at support for this speculation. Even if Texas Oil's argument were supported by evidence, it would not persuade. Tenneco was entitled to assess its own interests, and it has not complained of Morgan Stanley's handling of the transaction. While a principal's complaint is not conclusive of whether its agent has acted in its best interest, absent any complaint an agent cannot be said to have acted contrary to its principal's best interests.

Accordingly, we conclude that there was no evidence that Morgan Stanley failed to act in Tenneco's best interests.

## IV

Nor do we find evidence that Morgan Stanley was motivated by interests at odds with Tenneco's interests. Texas Oil's sole explanation for Morgan Stanley's "theft of millions of dollars from Tenneco's coffers" is that Morgan Stanley hoped to obtain future business from Seagull by helping Seagull acquire Houston Oil cheaply. The evidentiary basis for this contention is testimony by Morgan Stanley's representative that yes, Morgan Stanley would like to do business with Seagull as well as other businesses. Texas Oil does not argue that Morgan Stanley had any particular piece of business in mind, only that Morgan Stanley simply wanted to ingratiate itself with Seagull in hopes of a future relationship.

In fact, the record does not reflect that Morgan Stanley did any other business with Seagull after the Houston Oil purchase, but that is not the full answer to Texas Oil's contention. To meet the requirement of *Holloway*, Morgan Stanley's actions must have been so contrary to Tenneco's best interests that Morgan Stanley could have been motivated only by personal interests. It is simply implausible that Morgan Stanley would have intentionally deprived Tenneco of millions of dollars in the sale of Houston Oil and risked a relationship with Tenneco, according to Texas Oil, "as one of their primary merchant bankers ... dealing with literally hundreds of millions, billions of dollars", in hopes that Seagull might throw a little business Morgan Stanley's way. The rule in *Hollo-*

*way* contemplates an agent's intentional, willful breach of trust with its principal. There is no evidence Morgan Stanley engaged in such conduct.

\* \* \* \* \*

For these reasons, we conclude that Morgan Stanley was entitled to summary judgment. Accordingly, the judgment of the court of appeals is reversed insofar as it reversed the judgment of the district court, and judgment is rendered that Texas Oil take nothing against Morgan Stanley.

ENOCH, Justice, concurring.

I write separately because I believe this case brings into sharper focus the concerns I expressed in *Holloway v. Skinner*, 898 S.W.2d 793, 803 (Tex.1995) (Enoch, J., concurring). As a general rule, an agent cannot be liable for tortiously interfering with his principal's contract because agent and principal are considered one and the same. *Holloway*, 898 S.W.2d at 795. In *Holloway*, however, the Court held that an agent acting within the scope of his authority may be liable to a third party for tortious interference if the agent does not act in good faith. *Holloway*, 898 S.W.2d at 796.

Although not explicitly articulated in its opinion, the Court in this case employs its standard from *Holloway*. As I stated in *Holloway*, I disagree with this standard. In my view, when an agent is acting under the authority of his principal, the results of the agent's conduct are actionable solely against the principal under breach of contract principles. This is so even if the agent acts in bad faith. Mere breach of contract is not actionable in tort. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex.1992).

The first question must be whether the agent acted within the scope of his authority. The plaintiff has the burden of proof, and if he fails to show the agent acted outside his authority, the inquiry is over, and the agent is not liable for tortious interference. If the plaintiff proves the agent acted outside the scope of his authority, however, he must also demonstrate that the agent did not act with a good faith belief that his actions were in the

best interest of the principal. In summary, the plaintiff can prevail against the agent for tortious interference only if the plaintiff shows lack of both authority and good faith.

Because this case comes to us on summary judgment in favor of Morgan Stanley, in order to prevail Morgan Stanley must prove, as a matter of law, that it acted within the scope of its authority as Tenneco's agent. Morgan Stanley avers by affidavit that it performed all services on behalf of Tenneco. This fact is not challenged. Further, it is undisputed in the summary judgment record that Tenneco hired Morgan Stanley to sell Houston Oil & Minerals. This evidence establishes that Morgan Stanley acted within the scope of its authority in negotiating the sale of Houston Oil & Minerals. Texas Oil offers no evidence that creates a question of fact as to this issue. Therefore, as a matter of law, Morgan Stanley cannot be liable for tortious interference with the prospective business relationship between its principal— Tenneco—and Texas Oil. Given that Morgan Stanley acted within the scope of its authority, the Court's discussion of good faith is unnecessary and misleading.

Because I agree that Morgan Stanley negated as a matter of law a necessary element of tortious interference, I concur in the Court's judgment.